| | | |
|---|---|---|
| Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>PANEL III | | |
| EDGARDO VAN RHYN SOLER<br><br>Parte Recurrida<br><br>v.<br><br>MULTINATIONAL LIFE INSURANCE CO.<br><br>Parte Peticionaria | KLCE202201292 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Civil núm.:<br>K PE2014-0524<br><br>Sobre:<br>Despido Injustificado |

Panel integrado por su presidente, el Juez Figueroa Cabán, la Juez Grana Martínez y el Juez Rodríguez Flores

Rodríguez Flores, Juez Ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 31 de mayo de 2023.

Comparece Multinational Life Insurance Co. (Multinational) mediante recurso de *certiorari* instado el 28 de noviembre de 2022. Solicita que revoquemos la *Sentencia Parcial* emitida el 4 de noviembre de 2022 y notificada el 14 de noviembre de 2022, por el Tribunal de Primera Instancia (TPI), Sala de San Juan. Mediante el referido dictamen, el TPI concluyó, de manera sumaria, que el Sr. Edgardo Van Rhyn Soler (Sr. Van Rhyn) renunció voluntariamente al puesto que ocupaba en Multinational mediante un acuerdo transaccional válido: Por ello, resolvió que el Sr. Van Rhyn no fue despedido por Multinational ni se configuró un despido injustificado, en la modalidad de despido constructivo. No obstante, el TPI coligió que la cláusula del referido acuerdo, en la que el Sr. Van Rhyn renunció a la mesada que establece la Ley Núm. 80, *infra,* es contraria a derecho, puesto que dicho estatuto expresamente reconoce el carácter irrenunciable de dicha indemnización. Por tanto, ordenó a las partes a estipular la cuantía de la mesada que le corresponde al Sr. Van Rhyn.

Con el beneficio de la *Oposición a que se Expida Auto de Certiorari* presentada por el Sr. Van Rhyn, expedimos el auto de *certiorari,* modificamos la *Sentencia Parcial* recurrida y devolvemos el caso al TPI para la continuación de los procedimientos acorde con lo aquí resuelto.

I.

El 4 de marzo de 2014, el Sr. Van Rhyn instó una querella[1] por despido injustificado al amparo del procedimiento sumario laboral establecido en la Ley Núm. 2 del 17 de octubre de 1961, 32 LPRA secs. 2118-3111, en contra de Multinational Life Insurance Co. (Multinational), antes conocida como National Life Insurance Co. (NALIC). El Sr. Van Rhyn alegó que trabajó para dicha empresa, mediante contrato de empleo a tiempo indeterminado, desde el 16 de enero de 2006 hasta el 11 de noviembre de 2011, cuando su patrono lo forzó a renunciar a su puesto de trabajo mediante amenaza de despido y la promesa de continuar una relación de negocios que nunca se concretizó.

En específico, el Sr. Van Rhyn aseveró que el presidente de Multinational, Sr. Tobías Carrero Nácar (Sr. Carrero Nácar) le informó que, si no presentaba su renuncia al puesto que ocupaba en Multinational, se vería en la obligación de despedirlo. Ante ello, y ante la presunta solicitud del Sr. Carrero Nácar, el 10 de noviembre de 2011, el Sr. Van Rhyn firmó un *Acuerdo y Relevo General*[2] con Multinational, mediante el cual renunció a su puesto en la empresa - efectivo al 11 de noviembre de 2011 - y relevó a su patrono de cualquier reclamación que pudiera tener en su contra, a cambio de la suma de $164,913.95 por concepto de salarios y demás beneficios acumulados como empleado, sin "ningún descuento legal conforme a las disposiciones de la Ley #80 del 30 de mayo de 1976,

---

[1] Apéndice del recurso, págs. 25-28.
[2] *Íd.*, págs. 167-177.

según enmendada"[3]. Acorde con ello, en la cláusula número diez (10) del referido acuerdo, el Sr. Van Rhyn se comprometió a no presentar reclamación, causa de acción o remedio al que tuviera derecho al amparo de la Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA secs. 185a-185n, sobre despido injustificado.

En su querella, el Sr. Van Rhyn explicó que firmó el referido acuerdo porque Multinational le ofreció continuar la relación de negocios entre las partes, consistente en que el Sr. Van Rhyn recibiría $15,000.00 a cambio de la prestación de servicios de consultoría. Sin embargo, la relación de negocios entre las partes no continuó. Así, el Sr. Van Rhyn planteó una presunta violación a la Ley Núm. 80, *supra,* en la modalidad de despido constructivo, alegando que su patrono solapó su despido con una terminación de empleo mediante renuncia voluntaria. Asimismo, señaló que, siendo el pago de la mesada un derecho irrenunciable, la cláusula del *Acuerdo y Relevo General* en la que renunció a dicha compensación era nula. De tal forma, solicitó una compensación por concepto de mesada, ascendente a $381,490.00, más una suma no menor al 25% de la cuantía concedida, en honorarios de abogado.

Oportunamente, Multinational presentó su contestación a la querella.[4] Sostuvo que las alegaciones de la demanda no configuraban un despido constructivo, debido a que el Sr. Van Rhyn no fue forzado a renunciar, sino que, luego de negociar el *Acuerdo y Relevo General*, éste renunció libre y voluntariamente a su empleo. Además, relevó a su patrono de cualquier reclamación que pudiera tener en su contra, incluyendo la causa de acción incoada. Asimismo, afirmó que el referido acuerdo no estaba condicionado al cumplimiento de promesas económicas, más allá de aquellas contenidas en sus propias cláusulas.

---

[3] *Íd.*, pág. 169.
[4] *Íd.*, págs. 29-42.

En la alternativa, Multinational señaló que, de haber acaecido un despido, lo cual negó, éste estuvo justificado, al amparo de las defensas afirmativas presentadas, tales como que las medidas tomadas estuvieron enmarcadas dentro del interés de asegurar el buen y normal funcionamiento de la empresa, razones legítimas de negocio y la reestructuración y reorganización de ciertas plazas de la empresa. Por consiguiente, concluyó que el Sr. Van Rhyn no tenía derecho a indemnización alguna por concepto de despido injustificado. Por último, Multinational solicitó la conversión del trámite sumario a ordinario y, para la eventualidad de que el tribunal lo autorizara, incluyó una reconvención.

En la conferencia inicial el TPI denegó convertir el caso al trámite ordinario y no autorizó la reconvención. Sin embargo, permitió un descubrimiento de prueba más amplio del que provee la Ley Núm. 2, *supra*. En dicha vista, las partes presentaron el Informe de Manejo del Caso.[5]

Luego, en una vista sobre el estado de los procedimientos del caso, las partes informaron haber completado el descubrimiento de prueba. Posteriormente, el 29 de abril de 2022, las partes presentaron el *Informe Enmendado sobre Conferencia con Antelación a Juicio.*[6] En éste, presentaron estipulaciones de hechos, documentos y asuntos sobre los cuales no existía controversia.[7] El

---

[5] Véase, *Minuta Resolución* notificada el 12 de septiembre de 2014. Apéndice del recurso, págs. 43-47.

[6] *Íd.,* págs. 70-98.

[7] En específico, las partes estipularon los siguientes hechos: (1) El Querellante trabajó para NALIC [National Life Insurance Company] durante más de cinco (5) años, mediante contrato de empleo a tiempo indeterminado; (2) Para el 26 de abril de 2007, el Querellante fue nombrado Presidente de NALIC hoy MLIC [Multinational Life Insurance Company]; (3) El 10 de noviembre de 2011, Van Rhyn y NALIC, hoy MLIC, a través del Sr. Tobías Carrero Nácar, firmaron un Acuerdo y Relevo General; (4) El 10 de noviembre de 2011, el mismo día que el Querellante firmó el Acuerdo y Relevo General, el Querellante y MIC [Multinational Insurance Company], a través del Sr. Tobías Carrero Nácar, firmaron un Contrato de Servicios Profesionales y de Confidencialidad; (5) Multinational Life Insurance Company ("Multinational Life") es una aseguradora debidamente [organizada] por la Oficina del Comisionado de Seguros de Puerto Rico (de ahora en adelante, OSC), para la venta de seguros de salud, vida e incapacidad; (6) Multinational Life operó durante varias décadas bajo el nombre de National Life Insurance Company (NALIC). Para el 11 de noviembre de 2011 solicitó a la OSC cambiar el nombre por el de Multinational Life Insurance Company. El 14 de diciembre de 2011 la OSC

TPI aceptó el informe, excluyendo las notas no autorizadas durante las vistas en que se discutió el mismo y las reservas sobre nuevos testigos o prueba documental.[8]

Así las cosas, el 10 de junio de 2022, se presentó la *Solicitud de Sentencia Sumaria por Multinational Life*.[9] Alegó que no existía controversia sobre los hechos materiales del caso, por lo que solamente restaba aplicar el derecho y dictar sentencia sumaria a su favor desestimando la demanda por carecer de una reclamación que justificara la concesión de algún remedio. Multinational propuso 77 hechos incontrovertidos en los que, en síntesis, arguyó que el Sr. Van Rhyn había renunciado libre y voluntariamente a la empresa al suscribir el *Acuerdo y Relevo General*, por lo que no podía concluirse que éste fue despedido de su empleo. Añadió que, en dicho acuerdo, el Sr. Van Rhyn también expresamente había renunciado a cualquier reclamación que tuviera en contra de su patrono. Adujo que el *Acuerdo y Relevo General* constituía una transacción válida que impedía que el Sr. Van Rhyn instara la presente acción civil.

En cuanto al planteamiento de nulidad de la renuncia a la mesada, Multinational argumentó que las alegaciones y la prueba documental no establecían la ocurrencia de un despido, por lo cual, resultaba improcedente en derecho proveer para el pago de la mesada que establece la Ley Núm. 80 sobre despido injustificado.[10]

---

[8] Véase, *Orden. Íd.*, pág. 101.

[9] *Íd.*, págs. 103-137.

[10] En apoyo a la solicitud de sentencia sumaria, Multinational acompañó los siguientes documentos: (1) contestación a demanda y reconvención del caso núm. K AC2012-0306; (2) contestación enmendada a demanda y reconvención enmendada del caso núm. K AC2012-0306; (3) Acuerdo y Relevo General el 10 de noviembre de 2011; (4) carta de renuncia del 11 de noviembre de 2011; (5)

autorizó formalmente ese cambio de nombre; (7) El querellante trabajó para la empresa querellada desde el 16 de enero de 2006. Empezó como vicepresidente ejecutivo senior, ocupó los puestos de presidente de NALIC y principal oficial ejecutivo y la fecha de terminación del empleo fue el 11 de noviembre de 2011. Igualmente, las partes estipularon como exhibit conjunto el Acuerdo y Relevo General del 10 de noviembre de 2011. No obstante, solamente se estipuló la autenticidad, y no así el contenido, del Contrato de Servicios Profesionales y de Confidencialidad del 10 de noviembre de 2011, el Reconocimiento de Empleo de 6 de mayo de 2011 y la carta de terminación de empleo del 10 de noviembre de 2011 suscrita por la Sra. Janet Ramos. *Íd.*, págs. 74-75.

El 12 de julio de 2022, el Sr. Van Rhyn presentó su *Moción en Oposición a Solicitud de Sentencia Sumaria.*[11] Señaló que los hechos incontrovertidos propuestos por Multinational eran impertinentes y no esenciales a las controversias planteadas. No obstante, el Sr. Van Rhyn refutó cada hecho propuesto por Multinational. Afirmó que existía controversia respecto a su voluntariedad para suscribir el *Acuerdo y Relevo General,* puesto que lo firmó bajo coacción mediante amenaza de despido y consideraciones económicas que nunca se cumplieron.

En su moción en oposición, el Sr. Van Rhyn propuso otros 46 hechos que, a su juicio, ameritaban que se dictara sentencia sumaria a su favor en la que se declarara con lugar la querella sobre despido injustificado y la reclamación de mesada. Planteó que los hechos por él propuestos establecían que su renuncia fue forzada, lo que equivale a un despido cobijado por la presunción de que estuvo injustificado. Añadió que Multinational no rebatió la referida presunción, por lo que le correspondía pagar la correspondiente mesada. Por último, y ante el carácter irrenunciable del derecho a la mesada que provee la Ley Núm. 80, el Sr. Van Rhyn solicitó que se declarara la nula su renuncia a tal derecho y, consecuentemente, se le concediera el remedio de la mesada.[12]

En su *Réplica a Oposición a Sentencia Sumaria*[13], Multinational arguyó que, conforme al *Acuerdo y Relevo General,* le había pagado al Sr. Van Rhyn beneficios a los que no tenía derecho por haber sido un empleado exento. Reiteró que el Sr. Van Rhyn

---

cheques 8985 y 8987; (6) contrato de servicios profesionales y de confidencialidad del 10 de noviembre de 2011; (7) carta de Multinational del 10 de noviembre de 2011; (8) orden de la Oficina del Comisionado de Seguros del 18 de diciembre de 2011; (9) Resolución de la Oficina del Comisionado de Seguros del 7 de febrero de 2012; (10) Orden de la Oficina del Comisionado de Seguros del 27 de febrero de 2012; (11) Orden de la Oficina del Comisionado de Seguros del 27 de marzo de 2012; (12) transcripción de la deposición del Sr. Van Rhyn; (13) declaración jurada del Lcdo. Carlos Iguina Oharriz. *Íd.,* págs. 138-263.

[11] *Íd.,* págs. 271-341.

[12] La moción en oposición a la solicitud de sentencia sumaria fue acompañada con documentos en apoyo. *Íd.,* págs. 342-816.

[13] *Íd.,* págs. 826-864.

había firmado el referido acuerdo de forma voluntaria, razón por la cual no ocurrió un despido y, por tanto, tampoco controversia alguna que dirimir respecto al pago de la mesada.[14]

Por su parte, el Sr. Van Rhyn, en su *Dúplica a Réplica a Oposición a Moción de Sentencia Sumaria*[15], insistió que existía controversia en torno a las circunstancias y razones que culminaron en la terminación de su empleo.

Posteriormente, el 23 de septiembre de 2022, las partes presentaron una *Moción Conjunta en Cumplimiento de Orden*[16], mediante la cual estipularon 14 hechos materiales sobre los cuales no existía controversia.[17]

---

[14] Mediante *Solicitud de Autorización para Presentar el Presente Escrito en donde Surge Información Crucial y Bien Reciente de la cual este Tribunal Debe Advenir en Conocimiento, y; a los Efectos de que se Tome Conocimiento Judicial del Dictamen Desestimatorio Emitido en el Caso Civil KAC-2012-0306 que Incide y se Relaciona Directamente con las Alegaciones del Caso de Epígrafe,* Multinational anejó la *Resolución* emitida el 13 se septiembre de 2022, y notificada el 15 de septiembre de 2022, en el caso KAC2006-0306, en la que el TPI desestimó las alegaciones número 3.7 a 3.17, 3.21, 3.23 a 3.25, 3.27, 3.33, 3.41 a 3.46, y 3.49 (i) y (iii) de la segunda reconvención enmendada incoada por el Sr. Van Rhyn, en las que planteó su derecho constitucional a la intimidad ante el reclamo de mal manejo de fondos corporativos que presentó Multinational en su contra. *Íd.,* págs. 879-888.

[15] *Íd.,* págs. 865-872.

[16] *Íd.,* págs. 876-878.

[17] En específico estipularon: (1) El querellante, Sr. Edgardo Van Rhyn Soler, es mayor de edad, casado y residente de San Juan; Puerto Rico; (2) Multinational Life Insurance Company ("Multinational Life") es una aseguradora debidamente organizada por la Oficina del Comisionado de Seguros de Puerto Rico (de ahora en adelante OCS), para la venta de seguros de salud vida e incapacidad; (3) Multinational Life operó durante varias décadas bajo el nombre de National Life Insurance Company (NALIC). Para el 11 de noviembre de 2011 solicitó a la OCS cambiar el nombre por el de Multinational Life Insurance Company. El 14 de diciembre de 2011la OCS autorizó formalmente ese cambio de nombre; (4) El Querellante trabajó para NALIC, hoy Multinational Life, durante más de cinco (5) años, mediante contrato de empleo a tiempo indeterminado (5) El querellante trabajó para para la empresa querellada desde el 16 de enero de 2006. Empezó como vicepresidente ejecutivo senior, ocupó los puestos de presidente de NALIC y principal oficial ejecutivo y la fecha de terminación del empleo fue el 11 de noviembre de 2011; (6) Para el 26 de abril de 2007, fue nombrado presidente de NALIC, hoy Multinational Life; (7) El querellante cuenta con un Bachillerato de la Universidad Interamericana de Puerto Rico y un grado de Maestría en Administración de Empresas de la Universidad de Miami, además de haber tomado un sinnúmero de seminarios sobre estudios técnicos en el área de seguros; (8) El Sr. Van Rhyn manejó actividades de recursos humanos para cumplir con políticas, disposiciones federales y locales; (9) El Sr. Van Rhyn fue el presidente y principal ejecutivo de Option Health Care Network, Inc., desde el 2004 hasta que comenzó a trabajar en MALIC en el 2006; (10) Option Helath Care Network, Inc. fue creada en el 2004 al amparo de las leyes del Estado Libre Asociado de Puerto Rico; (11) Edgado Van Rhyn era accionista de Option; (12) Option Health Care Network, Inc. sirvió como "Third Party Administrator" (TPA) de los asegurados de NALIC (hoy Multinational Life) para los planes de salud de los empleados, dependientes, afiliados y pensionados de las dependencias, municipios e instrumentalidades del Gobierno de Puerto Rico; (13) Las partidas de dinero fueron pagadas al Sr. Van Rhyn mediante los cheques números 8985 y 8987 del 10 de noviembre de 2011; y (14) El 10 de noviembre de 2011, el mismo día que el querellante firmó el Acuerdo y Relevo General, el Querellante y MIC, a

Finalmente, el 4 de noviembre de 2022, el TPI dictó la *Sentencia Parcial* objeto del presente recurso. En ésta, consignó los siguientes sesenta y cinco (65) hechos incontrovertidos:

1. El querellante, Van Rhyn Soler, es mayor de edad, casado y residente de San Juan, Puerto Rico.

2. Multinational es una aseguradora debidamente organizada por la Oficina del Comisionado de Seguros (en adelante, "OCS"), para la venta de seguros de salud, vida e incapacidad.

3. Multinational operó durante varias décadas bajo el nombre de National Life Insurance Company. Para el 11 de noviembre de 2011, solicitó a la OCS cambiar el nombre por el de Mutinational Life Insurance Company. El 14 de diciembre de 2011, la OCS autorizó formalmente ese cambio de nombre.

4. El querellante trabajó para NALIC, hoy Multinational, durante más de cinco (5) años, mediante contrato de empleo a tiempo indeterminado.

5. Desde el 16 de enero de 20[0]6, Van Rhyn Soler trabajó para la querellada.

6. El querellante comenzó en la empresa como Vicepresidente Ejecutivo Senior y ocupó los puestos de Presidente de NALIC y Principal Oficial Ejecutivo.

7. Van Rhyn Soler culminó su empleo el 11 de noviembre de 2011.

8. El 26 de abril de 2011, el querellante fue nombrado Presidente de NALIC.

9. El querellante cuenta con un Bachillerato de la Universidad Interamericana de Puerto Rico y un grado de Maestría en Administración de Empresas de la Universidad de Miami, además, de haber tomado un sinnúmero de seminarios sobre estudios técnicos en el área de seguros.

10. Van Rhyn Soler manejó actividades de recursos humanos para cumplir con políticas, disposiciones federales y locales.

11. Van Rhyn Soler fue el Presidente y Principal Ejecutivo de Option Health Care Network, Inc. (en adelante, "Option"), desde el 2004 hasta que comenzó a trabajar en NALIC en el 2006.

12. Option fue creada en el 2004 al amparo de las leyes del Estado Libre Asociado de Puerto Rico.

13. Van Rhyn Soler era accionista de Option.

---

a través del Sr. Tobías Carrero Nácar, firmaron un Contrato de Servicios Profesionales y de Confidencialidad.

14. Option sirvió como *Third Party Administrator* de los asegurados de NALIC (actualmente Multinational) para los planes de salud de los empleados, dependientes y afiliados y pensionados de las dependencias, municipios e instrumentalidades del Gobierno de Puerto Rico.

15. Las partidas de dinero del Acuerdo y Relevo General fueron pagadas a Van Rhyn Soler mediante los cheques número 8985 y 8987 el 10 de noviembre de 2011.

16. El 10 de noviembre de 2011, el mismo día que se firmó el Acuerdo y Relevo General, Van Rhyn Soler y Multinational Insurance Company (en adelante, "MIC"), a través de Carrero Nácar, firmaron un Contrato de Servicios Profesionales y de Confidencialidad.

17. Van Rhyn Soler era un empleado exento de Multinational, entre otras empresas de National Group para las cuales también trabajó.

18. Van Rhyn Soler ha laborado en la industria de seguros por espacio de 28 años.

19. Durante ese tiempo se ha desempañado en múltiples posiciones de liderato en la industria de seguros dentro y fuera de Puerto Rico.

20. Van Rhyn Soler tenía conocimiento de lo que es la Ley Núm. 80.

21. Van Rhyn Soler había despedido empleados como parte de sus funciones.

22. Entre 1996 al 1998, Van Rhyn Soler trabajó como *Human Resources Operation & Finance Manager.*

23. Van Rhyn Soler realizó funciones para NALIC y para NALIC Insurance Company, Florida, entre otras compañías.

24. Van Rhyn Soler fue Presidente y Principal Oficial Ejecutivo de las siguientes compañías: National Insurance Company, NALIC, ambas corporaciones organizadas y existentes bajo las leyes del Estado Libre Asociado; las compañías afiliadas del estado de la Florida, National Group Insurance Company, NALIC Insurance Company, ambas corporaciones organizadas y existentes bajo las leyes del estado de la Florida.

25. Van Rhyn Soler trabajaba para estas empresas paralelamente.

26. Van Rhyn Soler trabajaba para las empresas conglomeradas bajo el nombre comercial de National Group.

27. Van Rhyn Soler se convirtió en el Presidente de National Insurance Company, NALIC y las compañías afiliadas al estado de la Florida, National Group

Insurance Company, NALIC Insurance Company desde finales del 2006 hasta que dejaron la empresa e intervino el Comisionado de Seguros en el 2009 o 2019 y de NALIC hasta que se hizo la venta de las acciones de Carrero Nácar.

28. A Van Rhyn Soler le solicitaron la renuncia.

29. Entre el 9 y 10 de noviembre de 2011, Carrero Nácar y Van Rhyn Soler negociaron los términos de un paquete de salida.

30. El día que Carrero Nácar le mencionó a Van Rhyn lo de su salida de NALIC, le solicita, además, la salida de Edgar Rodríguez.

31. Carrero Nácar y Van Rhyn Soler se habían conocido con anterioridad a la renuncia del querellante, ya que en más de una ocasión Carrero Nácar había visitado las oficinas de NALIC con el propósito de establecer relaciones comerciales, las cuales incluían la adquisición de las empresas relacionadas con NALIC y conocía de la experiencia y ejecutorias del querellante, al igual de su historial intachable de éxitos profesionales en el campo de los seguros dentro y fuera de Puerto Rico.

32. El 10 de noviembre de 2011, Van Rhyn Soler y NALIC, ahora Multinational, a través de Carrero Nácar, firmaron un Acuerdo y Relevo General.

33. Las partes que comparecieron en el Acuerdo y Relevo General fueron Van Rhyn Soler y NALIC.

34. Según la cláusula número 1 del Acuerdo y Relevo General, Van Rhyn Soler renunció libre y voluntariamente a su trabajo en NALIC.

35. Según la cláusula número 1 del Acuerdo y Relevo General, el último día de trabajo de Van Rhyn Soler fue el 11 de noviembre de 2011.

36. El 11 de noviembre de 2011, Van Rhyn Soler firmó una misiva en la cual presentaba su renuncia a la posición de Oficial Ejecutivo y Director de la Junta de Directores de NALIC.

37. Van Rhyn Soler recibió $164,913.95 por concepto de salarios y beneficios referentes a los meses de noviembre y diciembre de 2011, la totalidad de sus licencias de vacaciones y enfermedad, bono de Navidad y demás beneficios que acumuló hasta el 31 de diciembre de 2011, a cambio de la firma del Acuerdo y Relevo General.

38. Los cheques número 8985 y 8987 fueron cobrados y depositados por Van Rhyn Soler y no fueron devueltos por este.

39. En la cláusula número 6 del Acuerdo y Relevo General, Van Rhyn Soler acordó que, "luego de terminar

la relación de empleo entre las partes no se involucrará en ninguna actividad de negocios que constituya un conflicto de intereses con La Compañía".

40. En la cláusula número 20 del Acuerdo y Relevo General, a Van Rhyn Soler se le recomendó "consultar con su asesor legal antes de firmar este documento sobre el contenido y el alcance del mismo y significado de este Relevo General y reconoce que se ha otorgado este Acuerdo y Relevo General libre y voluntariamente y con el pleno conocimiento de las consecuencias legales que implica suscribir este documento".

41. En la cláusula número 22 del Acuerdo y Relevo General, a Van Rhyn Soler se le informó que tenía "hasta veintiún (21) días para recibir asesoramiento legal con respecto a este acuerdo. Del Sr. Van Rhyn firmar este Acuerdo antes de los veintiún (21) días, el Sr. Van Rhyn entiende y acepta que estuviese renunciando al remanente del tiempo".

42. En la cláusula número 24 del Acuerdo y Relevo General se establece que "el Sr. Van Rhyn expresa que este documento incorpora fielmente los acuerdos habidos entre las partes y que lo ha examinado detenidamente y luego de considerarlo, es su deseo firmar el mismo en el día de hoy".

43. Van Rhyn Soler admitió que negoció los términos y condiciones del Acuerdo y Relevo General con Carrero Nácar.

44. Van Rhyn Soler admitió que hubo más de dos (2) versiones del Acuerdo y Relevo General.

45. Van Rhyn Soler admitió que le realizó cambios al Acuerdo y Relevo General.

46. Van Rhyn Soler le manifestó a Carrero Nácar que si el interesaba que el dejara el puesto de Presidente que no tenía problemas con renunciar, pero que le compensaran con todos los beneficios que por Ley le correspondían.

47. Después del cambio de control en NALIC, y antes de suscribir los dos (2) documentos antes relacionados, Van Rhyn Soler se reunió en varias ocasiones con Carrero Nácar. En todas estas ocasiones, Van Rhyn Soler le proveyó a Carrero Nácar toda la información y documentación solicitada con relación a las operaciones de NALIC; además, conversaron sobre temas relacionados a la operación de NALIC y el interés de Carrero Nácar de continuar haciendo negocios con el querellante y con Option.

48. Van Rhyn Soler admitió que no fue obligado a firmar el Acuerdo y Relevo General.

49. Van Rhyn Soler tenía la opción de no firmar el Acuerdo y Relevo General.

50. Van Rhyn Soler reconoció que no había un ambiente hostil.

51. Van Rhyn Soler estuvo solo en el proceso de su salida. No estuvo asesorado por abogado en el proceso de negociación.

52. El cómputo del pago de $164,913.95 que se realizó a Van Rhyn Soler, lo hizo Janet Ramos Laboy, quien laboraba para NAPRO, una empresa de Carlos Benítez que le prestaba servicios a la organización.

53. Al momento en que se le entregó la misiva con fecha del 10 de noviembre de 2011 titulada Terminación de Empleo, Van Rhyn Soler entendió que no era Presidente de NALIC.

54. Van Rhyn Soler se enteró del cambio de accionistas en NALIC la semana del 7 al 11 de noviembre de 2011.

55. El Acuerdo y Relevo General no contiene ninguna condición relacionada o impuesta por Van Rhyn Soler con relación a otras consideraciones o contratos de trabajo u otros potenciales negocios.

56. Nada indica o condiciona el Acuerdo y Relevo General a la firma de un Contrato de Servicios Profesionales y de Confidencialidad.

57. El 10 de noviembre de 2011, el querellante y MIC firmaron un Contrato de Servicios Profesionales y de Confidencialidad.

58. El Contrato de Servicios Profesionales y de Confidencialidad fue firmado entre Van Rhyn Soler y MIC.

59. MIC es una aseguradora distinta a Multinational. MIC es una aseguradora de vida, salud e incapacidad y Multinational de propiedad y contingencia.

60. El Contrato de Servicios Profesionales y Confidencialidad tenía vigencia del 1 de enero de 2012 al 1 de enero de 2013.

61. NALIC no fungió como parte en el Contrato de Servicios Profesionales y de Confidencialidad.

62. La cláusula primera del Contrato de Servicios Profesionales y Confidencialidad establece que "[p]or el presente CONTRATO DE SERVICIOS PROFESIONALES Y DE CONFIDENCIALIDAD, MULTINATIONAL solicita del SR: VAN RHYN y este acepta colaborar con MULTINATIONAL y NALIC en carácter de asesor por servicios profesionales en todos los aspectos que MULTINATIONAL y NALIC considere y estime necesarias. Incluyendo, pero no limitándose, a asesoría directa del Sr. Tobías Carrero Nácar, Presidente de la Junta de Directores, al Sr. Luis Pimentel Zerbi, Presidente Ejecutivo y al Bufete Iguina-Oharriz, sus subsidiarias y afiliadas".

63. Mediante el Contrato de Servicios Profesionales y de Confidencialidad, Van Rhyn Soler no podía llegar a un acuerdo contractual con ninguna otra aseguradora si ello representaba un conflicto de intereses con MIC.

64. El Contrato de Servicios Profesionales y de Confidencialidad no condiciona el mismo al Acuerdo y Relevo General.

65. El 10 de noviembre de 2011, Carrero Nácar le entregó una misiva a Van Rhyn Soler que, conforme a las discusiones tenidas, deseaba que MIC y NALIC continuaran la relación contractual de negocios con Option.

(Notas al calce omitidas).

A tenor con los anteriores hechos incontrovertidos, el TPI concluyó que en el presente caso no se cumplían los requisitos de un despido constructivo. En esa línea, concluyó que la prueba documental había demostrado que el *Acuerdo y Relevo General* es un contrato de transacción válido, mediante el cual Sr. Van Rhyn renunció libre y voluntariamente a su empleo en NALIC, a cambio de una compensación, sin que mediara alguna condición o consideración adicional de contratos de trabajo u otros potenciales negocios. Además, resaltó que el Sr. Van Rhyn había admitido en su deposición que no fue obligado a firmar el referido *Acuerdo y Relevo General* y, además, éste había declarado que no existía un ambiente hostil en su empleo. Por tanto, el TPI coligió que la renuncia del Sr. Van Rhyn no estuvo motivada por actuaciones onerosas e injustificadas de su ex patrono y que el acuerdo entre las partes fue uno voluntario, en el que no había mediado coacción, dolo o intimidación. Razonó que tampoco se había demostrado que la única alternativa razonable que le quedaba al Sr. Van Rhyn era el abandono de su cargo.

En otro extremo, el TPI coligió que aun cuando la renuncia del Sr. Van Rhyn había sido libre y voluntaria, ésta había sido solicitada por su patrono. Por eso, razonó que para que fuera válido el *Acuerdo y Relevo General* éste debía cumplir con el pago total de la mesada,

dado el carácter irrenunciable de tal derecho a tenor con la Ley Núm. 80. Aclaró que la compensación que había recibido el Sr. Van Rhyn a cambio de la firma del *Acuerdo y Relevo General* fue únicamente por concepto de salarios y beneficios, ya que del documento no surgía que el monto incluyera la mesada. Cónsono con ello, el TPI declaró nula la cláusula número diez (10) del *Acuerdo y Relevo General,* mediante la cual el Sr. Van Rhyn había renunciado expresamente a su derecho a la mesada. Finalmente, puntualizó que las demás disposiciones del mencionado acuerdo continuarían en vigor, según lo permite la cláusula número veintiséis (26) del acuerdo. Conforme a lo anterior, ordenó a las partes estipular la cuantía de la mesada en un término de treinta (30) días. Asimismo, advirtió a las partes que, de éstas no ponerse de acuerdo, el tribunal citaría a las partes a una vista evidenciaria para oír a los peritos en materia de compensación laboral, única y exclusivamente en cuanto al cálculo de la mesada que corresponde al Sr. Van Rhyn.

Inconforme con el anterior dictamen, el 28 de noviembre de 2022, Multinational instó el presente recurso de *certiorari,* en el que formuló los siguientes señalamientos de error:

> Primer señalamiento de error: Erró el Honorable Tribunal de Primera Instancia al pasar por alto que la parte querellante-recurrida estaba vedada de llevar el caso de marras a la luz de la existencia y suscripción de un *Acuerdo y Relevo General* entre [é]l mismo y Multinational Life. Estamos ante un caso que no justifica la concesión de un remedio a la luz de la normativa jurisprudencia[l] aplicable a los Acuerdos de Relevo entre patronos y empleados.

> Segundo señalamiento de error: Erró el Honorable Tribunal de Primera Instancia al aplicar incorrectamente al caso de autos la Ley Núm. 80, supra, y resolver que procede el pago de una mesada cuando ni hubo una situación de un despido injustificado, menos aún de despido constructivo, según alegó e invocó la parte querellante-recurrida en su Querella.

En esencia, Multinational arguye que, por virtud del *Acuerdo y Relevo General,* el Sr. Van Rhyn se encontraba impedido de entablar la demanda de epígrafe. Además, señala que, al haberse

firmado un acuerdo de transacción de renuncia libre y voluntaria, sin que hubiera mediado coacción, dolo o intimidación, no hubo un despido injustificado y, por tanto, no se activó el derecho a la indemnización por concepto de mesada que establece la Ley Núm. 80, supra. Así pues, plantea que el TPI actuó contradictoriamente al proveer para el pago de la mesada a pesar de haber concluido que no hubo un despido injustificado.

Por su parte, en la *Oposición a que se Expida Auto de Certiorari,* el Sr. Van Rhyn expone que la terminación de su empleo respondió a la renuncia solicitada por Multinational sin que existiera justa causa para ello. Argumentó que ello constituyó una renuncia forzada equivalente a un despido, cobijado por la presunción de que éste fue injustificado, sin que Multinational lograra rebatir tal presunción. Por ello, sostiene que el TPI actuó correctamente al reconocer el derecho de empleado al pago de la mesada y al declarar nula la renuncia a tal derecho.

El 9 de diciembre de 2022, al amparo de la autoridad que nos confiere la Regla 35(a)(1) de nuestro Reglamento[18], este Tribunal dictó una *Resolución* mediante la cual paralizó los procedimientos judiciales ante el TPI.

II.

-A-

**Sentencia sumaria**

El mecanismo de sentencia sumaria, regulado por la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, permite al tribunal disponer de un caso sin celebrar vista en su fondo, cuando no se presentan controversias genuinas de hechos materiales y solo resta aplicar el derecho a los hechos incontrovertidos.[19] El Tribunal podrá

---

[18] 4 LPRA Ap. XXII-B, R. 35(a)(1).

[19] *Segarra Rivera v. Int'l. Shipping et al.,* 208 DPR 964, 979 (2022); *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018); *Abrams Rivera v. E.L.A.,* 178 DPR 914, 932 (2010); *Nieves Díaz v. González Massas,* 178 DPR 820, 847 (2010); *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010).

dictar sentencia sumaria solamente cuando no exista ninguna controversia real sobre los hechos materiales y esenciales del caso y que, como cuestión de derecho, proceda dictarse sentencia sumaria a favor de la parte promovente. 32 LPRA Ap. V, R. 36.3(e).[20]

La Regla 36.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1, establece que una moción de sentencia sumaria debe estar fundada en declaraciones juradas, o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes.[21] Un hecho material es todo aquel que puede afectar el resultado de la reclamación, de acuerdo con el derecho sustantivo aplicable.[22] La controversia sobre el hecho material tiene que ser real. Así que, cualquier duda es insuficiente para derrotar una solicitud de sentencia sumaria. Esto es, la duda debe ser de tal naturaleza que se pueda colegir la existencia de una controversia real y sustancial sobre hechos esenciales y pertinentes a la controversia planteada en la solicitud de sentencia sumaria.[23]

Le corresponde a la parte que promueve la moción de sentencia sumaria establecer su derecho con claridad y demostrar que no existe controversia sustancial o real en cuanto a algún hecho material.[24] Dicha parte está obligada a desglosar los hechos sobre los que aduce no existe controversia y, para cada uno, especificar la página o el párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya.[25]

Por otro lado, la parte promovida tiene el deber de refutar los hechos alegados, con prueba que controvierta la exposición de la

---

[20] *León Torres v. Rivera Lebrón,* 204 DPR 20, 41 (2020); *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 430 (2013); *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012); *Ramos Pérez v. Univisión*, supra, pág. 214; *González Aristud v. Hosp. Pavía,* 168 DPR 127, 137-138 (2006).
[21] *Rodríguez García v. UCA,* 200 DPR 929, 940 (2018).
[22] *Segarra Rivera v. Int'l. Shipping et al.,* supra, pág. 980.
[23] *Bobé v. UBS Financial Services,* 198 DPR 6, 20 (2017).
[24] *Íd.*
[25] *Roldán Flores v. M. Cuebas et al.,* supra, pág. 676.

parte que solicita la sentencia sumaria.[26] A tales efectos, la parte que se opone tiene el deber de hacer referencia a los párrafos enumerados por la parte promovente que entiende que están en controversia y para cada uno detallar la evidencia admisible que sostiene su impugnación.[27] No podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que deberá contestar de manera detallada y específica, como lo hiciera la parte solicitante.[28]

Si el oponente no controvierte los hechos propuestos de la forma exigida por la Regla 36.3 de Procedimiento Civil, se podrán considerar admitidos y se dictará sentencia sumaria en su contra, si procede.[29]

En *Meléndez González, et al. v. M. Cuebas*[30], el Tribunal Supremo estableció el estándar específico, que, como foro apelativo, debemos utilizar al evaluar las concesiones o denegatorias de mociones de sentencia sumaria. A tales efectos, indicó que, de entrada, debemos examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil y la jurisprudencia exigen al foro primario. Además, debemos revisar que tanto la moción de sentencia sumaria, así como su oposición, cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil.[31] Igualmente, hay que revisar si existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil de exponer concretamente cuáles hechos materiales están en controversia y cuáles están incontrovertidos.[32] Por el contrario, si encontramos que los hechos materiales del caso

---

[26] *León Torres v. Rivera Lebrón,* supra, pág. 44; *Ramos Pérez v. Univisión,* supra, pág. 215; *Toro Avilés v. P.R. Telephone Co.,* 177 DPR 369, 383-384 (2009).
[27] *Roldán Flores v. M. Cuebas et al.,* supra, págs. 676-677.
[28] *Bobé v. UBS Financial Services,* supra, pág. 21.
[29] *Roldán Flores v. M. Cuebas et al.,* supra, pág. 677.
[30] 193 DPR 100 (2015).
[31] *Íd.,* pág. 118.
[32] *Íd.,* pág. 119.

realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente la norma jurídica aplicable a la controversia que tuvo ante sí.[33]

-B-

**Despido sin justa causa**

En nuestro ordenamiento jurídico, existe un interés apremiante en regular las relaciones obrero-patronales, pues de esta forma se busca proteger los derechos de los trabajadores. A raíz de ello, se han aprobado una serie de legislaciones, que incluye la *Ley de indemnización por despido injustificado,* Ley Núm. 80 de 30 de mayo de 1976, según enmendada (Ley Núm. 80), 29 LPRA sec. 185a, *et seq.*[34]

Dicho estatuto establece una protección al empleado de despidos injustificados, imponiéndole al patrono una sanción mediante un pago de una indemnización.[35] A tales efectos, el Artículo 1 de la Ley Núm. 80, establece que, aquellos empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) estén contratados sin tiempo determinado, (2) reciban una remuneración y (3) sean despedidos de su cargo, sin que haya mediado justa causa, tienen derecho al pago de una compensación por parte de su patrono (además del sueldo que hubiere devengado), denominada como la mesada.[36] El pago de la mesada es un derecho irrenunciable.[37]

---

[33] *Íd.*; *Segarra Rivera v. Int'l. Shipping et al.,* supra, págs. 981-982; *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

[34] La Ley Núm. 80, *supra,* fue enmendada por la *Ley de Transformación y Flexibilidad Laboral,* Ley Núm. 4 de 26 de enero de 2017, 29 LPRA sec. 121 *et seq.* Sin embargo, los hechos ante nuestra consideración versan sobre un empleado que fue contratado con anterioridad a la vigencia de esta ley. Las disposiciones de la nueva ley no le aplican, por lo que no será objeto de nuestro análisis.

[35] *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 208 (2021); *León Torres v. Rivera Lebrón,* supra, pág. 36; *González Méndez v. Acción Social et al.,* 196 DPR 213, 229 (2016).

[36] *Lugo Montalvo v. Sol Meliá Vacation,* 194 DPR 209, 230 (2015).

[37] 29 LPRA sec. 185i; *Vélez Cortés v. Baxter,* 179 DPR 455, 466 (2010).

Ahora bien, en Puerto Rico no existe una prohibición absoluta contra el despido de un empleado.[38] Un patrono puede despedir a su empleado, sin sanción alguna, si este demuestra la existencia de una justa causa para ello.[39] El Artículo 2 de la Ley Núm. 80, *supra*, contiene varias de las circunstancias que constituyen justa causa para el despido. Estas incluyen tanto motivos fundamentados en la conducta del empleado como razones de índole empresarial.[40]

La Ley Núm. 80 establece un esquema probatorio mediante el cual, una vez el empleado despedido demuestra que cumple con los requisitos para ejercer la causa de acción, el patrono demandado tiene el peso de la prueba para establecer que el despido estuvo justificado. Si así lo prueba, el patrono no estará obligado a pagar la mesada.[41]

Por ende, para activar la protección generada por la Ley Núm. 80, y valerse de la presunción de que su despido fue injustificado, el trabajador tiene que demostrar que, en efecto, lo despidieron. Así, el empleado tiene que demostrar que cumple con los requisitos de la causa de acción: que fue empleado de un comercio, industria u otro negocio; que su contrato era por tiempo indeterminado, que recibía remuneración por su trabajo, y que fue despedido de su puesto.[42]

Ahora bien, la condición de haber sido despedido no está limitada por la definición usual del término despido. La definición de la Ley Núm. 80 abarca, además, las acciones dirigidas a inducir o forzar al empleado a renunciar, tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de

---

[38] *Segarra Rivera v. Int'l. Shipping et al.,* supra, pág. 982.
[39] *Romero et als. v. Cabrer Roig et als.,* 191 DPR 643, 651 (2014).
[40] 29 LPRA sec. 185b.
[41] *Íd.,* pág. 652.
[42] *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 907 (2011).

hecho o de palabra.[43] Es decir, el trabajador se siente tan incómodo con la situación laboral imperante en su lugar de empleo que no tiene otro remedio que abandonarlo.[44] A esta modalidad de despido se le conoce como despido constructivo o tácito.[45]

Nuestro Tribunal Supremo ha definido el despido constructivo como los actos voluntarios e injustificados realizados por un patrono, encaminados a obligar al empleado a dejar su trabajo, cuando la única alternativa razonable que le queda al empleado es abandonar el cargo.[46] Así que, no basta con cualquier molestia o condición antipática en el empleo, y, cuando se trate de vejámenes y humillaciones, estos deben ser de magnitud sustancial.[47]

De igual modo, tampoco se determina la magnitud y el efecto de los actos patronales con referencia a la visión subjetiva del empleado individual. Más bien, se utiliza un criterio objetivo al examinar si una persona razonable se sentiría forzada a renunciar como resultado de las acciones del patrono. Por tanto, no basta una mera alegación de que la renuncia fue un despido constructivo. Es decir, hace falta demostrar el despido, sea directo o en su modalidad constructiva o tácita.[48] Para ello, bastará con cumplir las exigencias de la Regla 110 de Evidencia.[49]

Así pues, en el caso que se alegue un despido constructivo, el trabajador tiene que demostrar que las circunstancias de su renuncia cumplen con los requisitos establecidos para llegar a esa conclusión. La presunción de despido injustificado no se activa hasta tanto el trabajador logre persuadir al juzgador de ese hecho

---

[43] 29 LPRA sec. 185e.
[44] *León Torres v. Rivera Lebrón,* supra, pág. 38.
[45] *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 907.
[46] *Íd.*, pág. 908; *S.L.G. Hernández-Beltran v. TOLIC*, 151 DPR 754, 777 (2000); *Arthur Young & Co. v. Vega III*, 136 DPR 157, 183 (1994).
[47] *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 908.
[48] *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 907.
[49] 32 LPRA Ap. VI, R. 110.

básico, entiéndase, que su renuncia fue en realidad un despido tácito o constructivo.[50]

Una vez un trabajador presenta una reclamación al amparo de la Ley Núm. 80 y cumple con los requisitos mencionados mediante alegaciones suficientes, se activa la presunción de que el despido fue injustificado. Activada la presunción, le corresponde al patrono probar, mediante preponderancia de la prueba, que existía justa causa para el despido.[51]

-C-

**Teoría general de los contratos**

En nuestra jurisdicción rige el principio de la libertad de contratación o la autonomía de la voluntad.[52] Esto implica que las partes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, la moral y el orden público.[53] De tal forma, nuestro ordenamiento jurídico establece el principio general de que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse según lo contratado.[54] Por consiguiente, los contratos serán vinculantes siempre y cuando concurran los siguientes requisitos: (1) el consentimiento de los contratantes, (2) un objeto cierto que sea materia del contrato y (3) la causa de la obligación que se establezca.[55]

En lo que respecta al consentimiento de las partes, éste pierde eficacia jurídica cuando haya mediado error, dolo, violencia o intimidación en el proceso de contratación.[56] De estar presente

---

[50] *Rivera Figueroa v. The Fuller Brush Co.*, supra, págs. 911-912.

[51] *Íd.*, pág. 913.

[52] *Coop. Sabaneña v. Casiano Rivera,* 184 DPR 169, 173 (2011).

[53] *Torres, Torres v. Torres et al.,* 179 DPR 481, 493 (2010); 31 LPRA sec. 3372 (derogado). Todas las referencias al derogado Código Civil de 1930, vigente al momento de los hechos objeto de la presente causa.

[54] 31 LPRA sec. 2994 (derogado); *Rodríguez García v. UCA,* 200 DPR 929, 943 (2018).

[55] 31 LPRA sec. 3391 (derogado); *Demeter Int'l v. Srio. Hacienda,* 199 DPR 706, 726-727 (2018).

[56] 31 LPRA sec. 3104 (derogado).

alguno de estos fatores, la parte perjudicada tiene una causa de acción a ser ejercitada dentro del periodo de cuatro (4) años a partir de la consumación del negocio o desde que ha cesado la violencia o intimidación.[57]

La intimidación que anula el consentimiento de un contratante es aquella que se compone de una amenaza que produce temor o miedo razonable. A su vez, al estimar si medió intimidación en la contratación, ha de observarse la edad, sexo y condición de la persona cuyo consentimiento presuntamente quedó viciado.[58] Hay que añadir que el temor a desagradar a las personas a quienes se debe sumisión y respeto no anulará el contrato.[59]

Para que la intimidación o coacción vicie el consentimiento y produzca la nulidad del contrato, deben cumplirse los siguientes elementos: (a) que se emplee contra uno de los contratantes la amenaza de un mal inminente y grave, susceptible por ende, de ejercer seria influencia sobre su ánimo; (b) que esta amenaza determine la declaración de voluntad, o lo que es igual, que exista un nexo causal entre la intimidación y el consentimiento, (c) que la repetida amenaza y el influjo que pueda ejercer sobre la voluntad revistan un matiz antijurídico, por cuanto no quepa reputarlos ilícitos como consecuencia de una correcta y no abusiva utilización de los derechos.[60]

Por otro lado, existe dolo cuando, mediante palabras o maquinaciones insidiosas de parte de uno de los contratantes, el otro es inducido a celebrar un contrato que, sin ellas, no hubiera realizado.[61] Para que el dolo produzca la nulidad de un contrato,

---

[57] 31 LPRA sec. 3512 (derogado); *SLG Ortiz Alvarado v. Great American,* 182 DPR 48, 62-63 (2011).
[58] *Nassar Rizek v. Hernández,* 123 DPR 360, 376-377 (1989).
[59] 31 LPRA sec. 3406 (derogado).
[60] *Nassar Rizek v. Hernández,* supra, pág. 376, citando a José María Manresa, *Comentarios al Código Civil Español,* 6ta ed., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, pág. 575.
[61] 31 LPRA sec. 3408 (derogado).

debe ser grave y no haber sido empleado por ambas partes contratantes.[62] Además, el dolo considerado grave que produce la nulidad del contrato tiene que recaer sobre elementos esenciales del contrato y determinar el consentimiento. Es aquello que inspira a contratar, sin lo cual no hubiera mediado una contratación.[63]

A su vez, el error que invalida el consentimiento debe recaer sobre la sustancia de la cosa que fuere objeto del contrato, o sobre aquellas condiciones de ésta que principalmente hubiesen dado motivo a celebrarlo.[64]

-D-

**El contrato de transacción y la mesada**

El contrato de transacción permite a las partes otorgar un acuerdo, para evitar que ocurra un pleito potencial o poner fin a un litigio que ya comenzó. A las transacciones le aplican las normas generales sobre la interpretación de los contratos, siempre que no sean incompatibles con el acuerdo entre las partes. Un contrato de transacción adquiere vida jurídica, cuando: (1) existe una relación incierta o litigiosa entre las partes, (2) las partes tienen la intención de sustituir esa relación incierta o litigiosa por una cierta y (3) las partes se hacen concesiones recíprocas.[65]

Existen dos tipos de contratos transaccionales: los judiciales y los extrajudiciales. Cuando las partes alcanzan un acuerdo que elimina la controversia antes de iniciar un pleito, o luego de comenzado el litigio, pero sin la intervención del tribunal – y, por ende, se desiste de la causa de acción – estamos ante un acuerdo extrajudicial. En otro extremo, si luego de iniciado el pleito, las partes acuerdan eliminar la disputa y solicitan incorporar el acuerdo

---

[62] 31 LPRA sec. 3409 (derogado).

[63] *Pérez Rosa v. Morales Rosado*, 172 DPR 216, 230, nota al calce núm. 6 (2007), que cita de J.R. Vélez Torres, *Curso de derecho civil: derecho de contratos*, San Juan, Rev. Jur. U.I.P.R., 1990, T. IV, Vol. II, págs. 58-61.

[64] 31 LPRA sec. 3405 (derogado).

[65] *Demeter Int'l v. Srio. Hacienda*, supra, págs. 729-730.

al proceso judicial, se trata de un contrato de transacción judicial que tiene el efecto de culminar el pleito.[66]

En *Orsini v. Srio. de Hacienda*[67], el Tribunal Supremo reconoció la validez de un contrato de transacción en el cual el patrono le concede al empleado el pago de la mesada en el contexto de un despido injustificado. Ello, en atención a la naturaleza irrenunciable del derecho a la mesada cuando el despido es sin justa causa. Al respecto, expresó:

> La "mesada" es producto de una obligación legal que tiene el patrono de indemnizar a un empleado por despedirlo injustificadamente. De ordinario, este tipo de compensación se obtiene luego de un proceso judicial. Sin embargo, los patronos han optado por transar el pago de esta indemnización, mediante los denominados "Acuerdos de Relevo". Esta modalidad de compensación por el despido responde a una obligación contractual, con la diferencia de que esta clase de contrato, por su naturaleza transaccional, está supeditado a que ambas partes consientan a las concesiones recíprocas. Además, para que sean válidos, estos acuerdos deben cumplir con el pago total de la "mesada", porque el derecho a ésta no es renunciable.[68]

III.

La Regla 52.1 de Procedimiento Civil, *supra*, nos faculta a expedir el auto de *certiorari* cuando se recurre de la denegatoria de una moción de carácter dispositivo, como lo es una moción de sentencia sumaria.[69] En virtud de ello, ejercemos nuestra discreción y expedimos el auto solicitado.

En el presente caso, el TPI concluyó que no se cumplían los requisitos de un despido constructivo, debido a que se demostró que, mediante el *Acuerdo y Relevo General,* el Sr. Van Rhyn había renunciado a su empleo de manera libre y voluntaria. Por otro lado,

---

[66] *Íd.,* pág. 730.
[67] 177 DPR 596 (2009) (revocado en *Ortiz Chévere et al. v. Srio. Hacienda*, 186 DPR 951 (2012), en cuanto al aspecto contributivo de la indemnización recibida por el empleado).
[68] *Íd.,* pág. 629.
[69] Entre las mociones de carácter dispositivo, cuya denegatoria por el foro primario permite el ejercicio de nuestra función revisora, se encuentran la moción de desestimación, de desistimiento, de sentencia sumaria o de sentencia por las alegaciones. *Rivera Figueroa v. Joe's European Shop,* 183 DPR 580, 594 (2011).

el TPI declaró nula la cláusula del referido acuerdo en la que el Sr. Van Rhyn renunció al derecho de indemnización por concepto de mesada. A tenor con ello, ordenó a las partes a estipular la cuantía de la mesada.

Multinational arguye que el TPI actuó contrario a derecho al proveer para el pago de la mesada, a pesar de haber concluido que no se configuró un despido constructivo. Multinational no cuestionó los hechos incontrovertidos apuntados por el TPI. Más bien, sus señalamientos de error van dirigidos a cuestionar la aplicación del derecho por parte del foro primario.

Por su parte, el Sr. Van Rhyn señala que la terminación de su empleo respondió a la petición de renuncia de su patrono, lo que constituyó una renuncia forzada, equivalente a un despido, con la presunción de que fue sin justa causa. Indica que al patrono no lograr rebatir tal presunción, el TPI actuó correctamente al reconocer el derecho al pago de la mesada por despido injustificado.

Según expuesto, este Tribunal de Apelaciones se encuentra en la misma posición que el TPI al momento de revisar una solicitud de sentencia sumaria.[70] Por consiguiente, este Tribunal solo puede considerar los documentos que se presentaron ante el TPI y determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de manera correcta.

Aclarado lo anterior, luego de analizar la solicitud de sentencia sumaria presentada por Multinational, así como la oposición del Sr. Van Rhyn, concluimos que los hechos incontrovertidos esbozados por el TPI están apoyados en la prueba

---

[70] Del examen de la *Solicitud de Sentencia Sumaria por Multinational Life,* surge que ésta incluyó y relacionó la prueba documental en la que basó sus alegaciones y fundamentó su postura en derecho. Por tal razón, concluimos que la moción cumple con la Regla 36.3(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(a). Asimismo, la *Moción en Oposición a Solicitud de Sentencia Sumaria,* presentada por el Sr. Van Rhyn, cumple con los requisitos de la Regla 36.3(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(b).

que obra en autos y no existe controversia genuina de hechos materiales. Por ello, los hacemos formar parte de este escrito.

A esos fines, corresponde determinar si los hechos incontrovertidos apuntados por el TPI son suficientes para adjudicar la causa de acción por despido constructivo.

La jurisprudencia define el despido constructivo como los actos voluntarios e injustificados por un patrono, encaminados a obligar al empleado a dejar su trabajo, siendo la única alternativa razonable para el empleado abandonar su cargo. En virtud de ello, una renuncia formal por parte de un empleado puede constituir causa de acción para reclamar por un despido injustificado, en la modalidad de despido constructivo.

Surge de los hechos incontrovertidos que, si bien es cierto que, conforme los términos del *Acuerdo y Relevo General,* el Sr. Van Rhyn renunció voluntariamente a su puesto en la empresa, dichos hechos igualmente establecen que a éste le pidieron la renuncia, pero bajo conversaciones de mantener una relación contractual. Sobre este punto, de las propias determinaciones de hechos incontrovertidos, surge que, el mismo día que se firmó el *Acuerdo y Relevo General,* el Sr. Van Rhyn y el Sr. Carrero Nácar, firmaron el *Contrato de Servicios Profesionales y de Confidencialidad.* En el *Acuerdo y Relevo General,* el Sr. Carrero Nácar compareció en representación de NALIC y, en el *Contrato de Servicios Profesionales,* representó a MIC. No obstante, una lectura del referido contrato de servicios profesionales refleja que, mediante éste, el Sr. Van Rhyn recibiría una remuneración de $15,000.00 mensuales a cambio la prestación de servicios de asesoría.[71] La esencia de la reclamación del Sr. Van Rhyn reside en su alegación de que firmó el *Acuerdo de Relevo General* tras la amenaza de despido de su patrono y luego de

---

[71] Apéndice del recurso, págs. 181-189.

concertar un acuerdo de servicios de consultoría por $15,000.00 mensuales.

También surge como hechos no controvertidos que, antes de suscribir los dos (2) documentos, el Sr. Van Rhyn y el Sr. Carrero Nácar conversaron sobre el interés de este último en continuar haciendo negocios con el primero.[72] En relación con ello, el TPI estableció que el Sr. Carrero Nácar le entregó una carta al Sr. Van Rhyn que ratificó por escrito dichas intenciones.[73]

Ciertamente, el *Contrato de Servicios Profesionales y de Confidencialidad* no estaba condicionado al *Acuerdo y Relevo General* y viceversa. Sin embargo, el hecho de que el referido *Acuerdo y Relevo General* carezca de cláusulas escritas que lo condicionen a algún otro pacto, de ninguna manera excluye las alegaciones del Sr. Van Rhyn relacionadas a las circunstancias que intervinieron en su voluntariedad o motivación para suscribir el acuerdo. Por ello, al evaluar si la renuncia en el presente caso equivale o no a un despido constructivo, resulta indispensable indagar las razones que circunvalaron dicha renuncia.

De manera que, de las alegaciones de las partes y de los documentos que forman parte de la solicitud de sentencia sumaria y la oposición, surgen elementos subjetivos en los que el factor de credibilidad es esencial. Así que, luego de revisar *de novo* el expediente de la forma más favorable al Sr. Van Rhyn, que es la parte que se opuso a la moción de sentencia sumaria, concluimos que los hechos incontrovertidos apuntados en la *Sentencia Parcial* resultan insuficientes para sostener una disposición sumaria de la reclamación de despido constructivo. En el presente caso existen controversias sobre aspectos esenciales de la causa de acción invocada que ameritan la celebración de un juicio en su fondo. Por

---

[72] Hecho incontrovertido núm. 47
[73] Hecho incontrovertido núm. 65.

consiguiente, resolvemos que el TPI erró al adjudicar de manera sumaria la causa de acción por despido constructivo.

Así pues, cónsono con el mandato de la Regla 36.4 de Procedimiento Civil[74], acogemos los hechos incontrovertidos de la *Sentencia Parcial* y determinamos que éstos no están en controversia. A su vez, exponemos los hechos materiales en controversia:

1. El motivo de la renuncia del Sr. Van Rhyn.

2. Si la renuncia del Sr. Van Rhyn fue voluntaria.

3. Las condiciones o actuaciones, si alguna, que Multinational le impuso al Sr. Van Rhyn.

4. Si las condiciones o actuaciones de su patrono obligaron al Sr. Van Rhyn a renunciar.

5. Si entre las partes existió alguna condición o consideración adicional de contratos de trabajo o potenciales negocios.

6. Si existieron otras alternativas a la renuncia.

Por último, coincidimos con el TPI en que la renuncia del Sr. Van Rhyn a la mesada y a cualquier otra reclamación a la que tuviera derecho al amparo de la Ley Núm. 80, sobre despido injustificado, fue contraria a derecho.

IV.

De conformidad con lo antes expuesto, este Tribunal expide el auto de *certiorari* y modifica el dictamen recurrido, a los efectos de restituir la causa de acción por despido injustificado al amparo de la Ley Núm. 80, que deberá ser atendida por el Tribunal de Primera Instancia en un juicio plenario. Se deja sin efecto la paralización de los procedimientos judiciales decretada mediante nuestra resolución del 9 de diciembre de 2022, y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos acorde con lo aquí resuelto.

---

[74] 32 LPRA Ap. V.

Lo acuerda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones